Your Honors, and may it please the Court, I'm Chris Cradiville here on behalf of the Appellants, Mr. David Clapper, Atlantic Midwest LLC and Atlantic 13 LLC. I'm joined at Council to the Appellants. Also, I would note that Mr. Clapper and his three children are present with us. They are here in the courtroom today. Now, Your Honors, there are multiple independent bases for reversing the final judgment of the District Court. But I think the most compelling and from a precedent-setting perspective, the most important reason to do so is the wildly inappropriate and improper closing argument presented by trial counsel for the defendants. I would just say that my very respected appellate colleagues were not trial counsel and I'm not in any way casting aspersions against appellate counsel. While decisions from this Court regarding improper closing argument are relatively rare, what's extraordinary about this particular closing argument is that it featured virtually every type of argument that this Court and its sister circuits have condemned as improper. Well, counsel, I looked through the record of this case. I've been around a long time and I've spent a lot of time in courtrooms. That's some of the performance of the lawyers back and forth in the exchanges which is extraordinary. I'm surprised as a new young judge, I suspect if I hadn't heard the tone of that trial, something I don't think I've ever witnessed, that would not have lasted very long in most courts. Your Honor, I 100% concur with you. But I just didn't want the case to go by without the comment about the exchanges among the lawyers back and forth. It's shocking. In this case, the behavior of counsel talking about kicking each other's rear ends and spanking people and calling people germs, the personal attacks on counsel are shocking. But I do want to ask why there was no motion for mistrial. It's not essential. We have some criminal cases that say that you don't have to have a motion for mistrial, but I don't really understand why a motion for mistrial wasn't made here. Yes, Your Honor, that's a very good question. First of all, I would agree with both your characterization of the tone and tenor of the trial and that that Judge Higginbotham offered. I've been doing this for 20 years. I was not trial counsel here. I've never read a transcript like this. It is, I would use Your Honor's phrase, shocking. As to why this error has been preserved, this case is unique, Judge Elrod, in that there are not one but two instructions that Judge Starr offered not to object during closing arguments, and they're plain on the face of the record. I'm not familiar— Those weren't really—they were about ticky-tack things and running objections. Did you get the impression that Judge Starr said you cannot complain, that they're insulting you personally? He used pretty strong language, Judge Elrod, in issuing the instruction not to object during closing statements. He used the phrase, I hate it, meaning those types of objections, and that's that record on appeal, 37279. Well, what about whenever they approached for the sidebar? Why wasn't that a perfect opportunity to say, and by the way, we're moving for a mistrial right now? So, Your Honor, in an ideal world, I think trial counsel could have moved for a mistrial, but I think there's also enough on this record, as your comments and Judge Higginbotham's comments indicate, that the court should have suus fonte and do a mistrial. Well, we're not foreshadowing, just characterizing, but I appreciate that. So, I do think— You don't think you think that they should have, but you think it doesn't matter. You have a case that says it doesn't matter? So, yes, Your Honor, there's several cases out of this circuit, and they are civil cases, not criminal cases, where plain error in closing argument is reviewable, and it is a plain error review, meaning denial of substantial justice, and we recognize that's a high standard, but the most recent would be Whitehead v. Foodmax, which was a case out of Jackson, Mississippi, a suit against Kmart, where the local plaintiff made multiple references to the out-of-state nature of the defendant during the closing and local prejudice, frankly, a lot less than was present in this case, and in that case, Judge Barksdale found that there was plain error on the face of that record. There are other cases, civil cases, from this court, Hall v. Fries and Edwards v. Sears-Robuck, also preserving— They're old cases. Judge Poliz wrote one. They're from the 80s and the 70s. We haven't had one in maybe the Texas Lawyers' Creed and other things, the Donde sanctions back in the day a long time ago, and we just haven't had this. No, and, Your Honor, that's why I said it at the outset. These cases don't come up that often, and while I think there's a lot of reversible error in this record, the reason I've elected to start with the closing arguments and the tone and tenor of the trial is this doesn't come up that often. The Whitehead case, v. Foodmax, that I cited a moment ago, is the most recent. That's from 1993. Hall v. Fries is from 85, and Edwards v. Sears-Robuck is from 1975, so it seems about once a decade, this sort of plain error on the face of the record comes up, and it takes an extraordinary case, but as Your Honor has correctly recognized, this is an extraordinary record. This is outside of the pale conduct. I'm from Dallas, but I didn't check. Were the lawyers from Dallas? So, yes, Mr. Shamoon, his lead counsel, Greg Shamoon, who, you know, is a larger-than-life Texas trial lawyer. He noted during the Vore Dyer, and this is of record in this case because he's proud of it, and he brought it up during Vore Dyer. He's the Dallas area lawyer famous for bringing a donkey as a witness to the Tarrant County State Courthouse some years ago, so we're dealing with, you know, master Texas trial lawyers with all that that implies. On the other hand, Mr. Both good and bad. I have nothing but respect for the trial bar, Your Honor. They're craftsmen, but in this case, they got to... Your Honor, Mr. Mihaljevic, Andy Mihaljevic, who was lead trial counsel to Mr. Clapper and his entities, was pro hoc vicee for this and in from Michigan, and there are seven references during the closing argument alone to Mr. Clapper, Mr. Mihaljevic, and their expert witness, Mr. Frizee, all being Michiganders. Was there a motion in limine that said you're not supposed to insult the expert witnesses? I mean, to actually say the word prostitute in the thing was surprising. Usually, there's sort of some sort of, and you were paid for your time, but to call them a prostitute flat out was really something. Yes, Your Honor, that word was used. Was there, I mean, did they have the normal motions in limine about all this and no? Judge Starr did issue an instruction during closing argument for the lawyers to refrain from insulting each other. I do not believe there was an express motion in limine about personal insults. I thought that was just assumed. You know, the expert witnesses, that's normally a basic motion in limine, but that's— And certainly, it's obviously fair game to talk about compensation that expert witnesses received. It was the framing of that issue, Judge Elrod, that was troubling on this record. In that sidebar that results in this two-sentence correction from a curative instruction from Judge Starr, Mr. Shimun uses an even stronger phrase than prostitute that I will not use in this courtroom, but it's very much there in the record. And there is a fair amount of profanity in this closing statement. We refrained from quoting that verbatim in our brief, but it is cited too, and it is in this record, Your Honor. And that's, again, part of what makes this an extraordinary and, to my mind, plain error case in terms of closing argument. What are the other bases that you did you want to address? Well, Your Honor, I wanted to just very quickly walk the court through what I think are the five categories of improper argument that was featured during this closing. The first, as I've already alluded to, is an appeal to local bias, and this court's most on-point precedent with that would be the Foodmax case from 1993. Again, seven references to Mr. Clapper, his entities, his lead counsel, and his expert being Michiganders. And there are some phrases used such as, quote, I don't know what they do in Michigan, but down here, you know, that old trope, that's at Record on Appeal 41171. There's a just go back to Michigan at Record on Appeal 41248. And there's a where I come from, and it ain't Michigan at Record on Appeal 41161. There are others. It's an appeal to sectionalism that really is out of place in 2022 America. How do you satisfy prong three? Prong three, Your Honor? Of the plain error standard. It's a denial of substantial justice, Your Honor, and I think it's on— You know, can you say that it would be a different outcome, likely? I think these five categories are so collectively prejudicial. And Your Honor makes a good point. We don't look at—and I think one of the flaws in the very capable brief that the defendant appellees submitted was they take these statements on a granular basis and try to look at them individually. This court's precedents, Foodmax, Paul V. Fries, Edwards V. Sears, Robach say that you have to look at the closing statement as a whole. And I think here, Your Honor, the sum is greater—the whole is greater than the sum of its parts. And the sum of its parts is substantial, but the whole is even greater when this is looked at as a coherent whole. So local bias, what's—you had five. Second, yes. References to Mr. Clapper's purported wealth. They claim that Mr. Clapper was a of Mr. Gene Phillips, one of the defendants, being in a state for the benefit of a widow and six children, and then refer to Mr. Clapper bringing this lawsuit as disgusting. That's at record on Appeal 41282. There was no evidence in closing argument to support that Mr. Clapper is a billionaire. He's not, nor does he own a 70-foot yacht. But you had, in closing argument, a contrast between a purported billionaire and billionaire yachtsman going after widows and orphans, with no evidence in the record to support that. That sort of appeal to the relative wealth imbalance of the parties, or even just saying that Mr. Clapper is wealthy and therefore doesn't need a judgment, is the improper argument. That's not something there's a lot of Fifth Circuit precedent on. The cases we've cited are from sister circuits. I think this is an excellent chance for the Fifth Circuit to weigh in on that appeal to wealth imbalance. Your Honor, it was several days, but I cannot give you a precise answer on that as I stand here today. They deliberated at some length, Your Honor. But Judge Elrod, returning to the five categories of error, the third is personal attacks on counsel, clients, and the expert. This transcript, if you read it in whole of the closing argument, commencing with the tossing of a box of Kleenex and Mr. Shmoon saying at the outset of closing argument, here, you're going to need these during my argument. There's an extraordinary amount of name-calling that went into this closing argument, but it's not just the name-calling. It really goes beyond that with the indication or the implication that violence against Mr. Clapper and or his counsel would be justified. Your Honor already alluded to the kick butt, and butt is not the word they use, up and down the alley. Whoop his butt, again, butt is not the word they use, and the spanking comment. Then there's the paid prostitute comment, along with a host of liar, deceitful, dishonest, dishonest broker, disgusting, pathetic, et cetera, and there are record sites throughout our brief for this. Did they call him a germ? Yes, they did. A germ. I believe that was directed at the Michigan-based expert, Mr. Frazee, but sometimes it's a little either is inappropriate, obviously, and then this court's most on-point precedent with regard to aspersions at counsel is Buford v. Rowan. That's a 1993 case, and I would say that the aspersions in that, which was a copycat lawsuit and a bad-faith lawsuit, were much milder than the aspersions cast at counsel, client, and expert witness, here. The fourth category of improper argument, personal opinions of counsel on their own truthfulness and the credibility of witnesses. There is a very blunt attack on Mr. Clapper's honesty, integrity, and credibility at record 41262-363. It's precisely the sort of direct attack on the veracity of a witness that is not proper. And the fifth and final category of improper argument is false statements not in evidence. I've already talked about the billionaire yachtsman comment not being backed by evidence. Then there's also at record on appeal 41276, one of the questions that did go to the jury was on alter ego. Opposing counsel said the man up there in the robe says, sorry, buddy, you don't get to alter ego there, indicating falsely that the court had already resolved the issue of alter ego, which was simply not true. They also stated that alter ego against a public company would be unheard of and would have attracted DOJ attention. Also not in the record. No evidence of that. Your Honor, I see my time is up. Unless the panel has any further questions for me, I believe I've saved five minutes for a double. Thank you, Chief Judge Owen. May it please the court. There are two critical points that I want to make at the outset. The first is if the plaintiffs thought that this was so extraordinarily harmful and so beyond the pale, why didn't they move for a mistrial? They conceded that they could have. Nothing stopped them, yet they didn't. Even though they had moved for mistrials earlier, these are sophisticated parties. Does it matter? It does matter. Why? Because by not moving for a mistrial, they made a choice. They took their chances on the jury verdict. They knew that they could have sought a mistrial, and if they thought it would have been granted, they should have moved for it. What authority says that they must move for a mistrial for closing argument? Isn't the authority actually to the contrary? No, the authority is not. Don't we have cases that say in closing argument you don't have to move for mistrial when that's the source of it? Don't we have that in the criminal context? I'm not aware of any cases in the civil context. They certainly have not cited any. But I said I think it's in the criminal context. I'm not aware of any, Your Honor. Are you aware of a case that says that you must move for a mistrial in order to get to reverse? In all of these cases, the cases from the 70s and 80s, do they move for a mistrial in every one of them? I'll start with the Roy case that we cite in our brief, and that's the case where this court says when you don't move for a mistrial, the effect is that you take your chances on the evidence presented and the ultimate verdict. And that brings me to the second critical point. None of these comments were prejudicial because the plaintiffs failed entirely to prove a key properties. Even if the court could somehow set aside this jury verdict, the defendants were entitled to judgment as a matter of law because the plaintiffs didn't provide any evidence of the value of the transferred properties. In fact, their expert acknowledged he did not attempt to value the properties because he wasn't asked to. And to the extent they talk about valuation and their expert, our expert, agreed that is not the same thing as fair market value. That's a historical accounting measure that is not the same as the fair market value. So they have a complete failure of proof on their part. How do you deal with the Hall v. Fries case, where not only was there no motion for mistrial, but there was no objection made at all by opposing counsel? Yes, and we are not saying that there is no way to review. There is. This court reviews for what's effectively plain error. But the important point is, even in cases where they do move for a mistrial based on comments, reversal is not proper unless the comments so permeate the proceedings that they impair substantial rights and cast doubt on the that was not a plain error case. It is still an extremely high standard. And in this case, that is one of our arguments, your honor. We did, your honor. We moved at the end of their case in chief and at the end of our case in chief and then again after trial. Now, of course, Judge Starr, he said at one point, I'm not kicking the jury out. He gave the case to the jury. This was a three-week trial, hard fought, obviously. The case had been going on for several years. So he said, I'm not kicking the jury out. I'm giving it to the jury. That's entirely proper. We're not suggesting he did anything wrong, because, of course, if the jury came back with a verdict that wasn't supported by the evidence, then, of course, he can still grant the directed verdict. Exactly. Exactly. And so I think that's another critical point to think about when you think about this long trial and, you know, the effect of closing argument and all of the other errors that they allege, is there's one person who had a front row seat to all of this and who was in a good position to judge what the effect of all of this trial conduct was. That's Judge Starr. He had seen it. He made the decision within his discretion to give curative instructions, which he did in the plaintiff's closing, in the defendant's closing, and again in the jury charge. There's a specific instruction that says, I've told you, lawyer arguments are not evidence. He said that over and over during the trial in response to both sides. Mr. Frederick, you, in your brief, you talk about colorful, non-threatening, you call it alleged bad state. Is it your position here today, sir, as an officer of the court, that this was not an improper argument? I mean, about the net worth, about the local prejudice, about the personal threats, the personal attacks on both counsel and expert. You're not saying that was a proper argument, are you, sir? Because your brief is a little bit vacillating on it, and I just want to make sure we're all clear because I know you to be an honorable member of the court, just like opposing counsel, and I don't want there to be misunderstanding on this. Well, let me be clear. I'm not telling the court that I would have chosen these words or that this is what counsel should do in every case. Should counsel do this in any Mr. Frederick, are you saying this was appropriate? I am not going to stake our appeal on the question whether it's appropriate or not. I think that is open to disagreement at the very least. You are not here today prepared to say it was inappropriate, but it doesn't matter. I'm very surprised by that. Well, let me say this. I think it is entirely understandable for people to think it's inappropriate. I think a lot of people, I'm not disagreeing with that, but my main point is that it doesn't matter because it was not prejudicial, but I think it's also, I can't deny, as I said, this is not how I would argue the case, but it is important based on this court's precedents that the statements that they rely on, although they could fairly be characterized as hyper-aggressive at the very least, they had a basis in the record. The yacht, the germ, those have a basis in the record, calling someone a germ and talking about someone's yacht. I didn't think that was in the record. Let me address both of those. The point about the germ, the quote was, it was something to the effect of when somebody tells you something that isn't true, we don't listen to another germ that comes out of that person's mouth. He didn't call him a germ. I think that is more an odd statement than an offensive statement because he's not saying that the person is a germ. It's an odd statement. The yacht, I think that is the exception that proves our point. When Mr. Shamu made the statement about the yacht, that was immediately corrected by the court who said that was not in evidence. Plaintiff's counsel stood up and said, that thing about the yacht is not in evidence. It's not true. That is an immaterial point. The broader point about comparative wealth, that is the danger, is comparative wealth. You need to help this poor party recover from this rich party. As we said in our brief, no juror could have understood that either of these parties was poor or disadvantaged in any way. These are sophisticated businessmen and business entities fighting over a lot of money, and so there was not an appeal to comparative wealth. You said there's a seven-person jury? That's correct, Your Honor. And I need to be sure also to address the plaintiff's argument that they were somehow prevented from objecting. That's not true. Judge Starr did issue an instruction before opening and I said, I really want you, if you have an objection, wait until they're finished, I'll look at you, and then you can come up at sidebar and we'll talk about it. By the time they got to closing, that still stood, but neither party understood that to mean they couldn't stand up and ask for a sidebar in the middle of the argument. But he told them at one point to sit down and that he would give them a running objection and just to sit down. Isn't that right? Well, he did tell Mr. Shamoon, the defense lawyer, wait, we'll do it later during closing, but the plaintiff stood up in the middle of defendant's closing and got a sidebar, so the parties did not understand that there was no way they could stand up. More importantly, there is no suggestion that they were ever told they would be shocking and it would be improper, but they weren't. They knew that they could move for a mistrial. The defendants moved for a mistrial during closing at 41139. The point is that the court gave a curative instruction several times during closing and the plaintiffs didn't seek further relief. If they thought it was so prejudicial that they had been denied a fair trial, there's a process for that. You move for a mistrial. How did it come to all this? How did it get so out of control? I have to confess, I don't know, Your Honor. I was not at the trial. I think what I can tell from the record is that these are two parties who had been in a bitter dispute and I think animosity had just built up over the years. That's the best I can say. I just don't know. But the lawyers, it's the lawyers driving it, not the parties in a dispute. Well, that's fair and I think the lawyers, neither one of them pulled any punches. I mean, if you... It is not accurate. I mean, the other side did not threaten to kick the other one's butt. I mean, that's the kind of thing that you see on those YouTube videos with prominent lawyer, you know, that people make, that they disparage our profession over. It's outrageous to threaten to want to beat people up, other lawyers. Let me address that because there are two things to say about that. First, what Mr. Shmoon said was, he did not threaten. He made an over-the-top comment that I should have done this or I would have done this. If I had it, if I had said that in an alley, I would have kicked his butt up and down that alley, I don't care if I was half-blind and half-lame, I would have found the strength to whoop his ass, okay, by accusing me of a felony, aggravated felony perjury. It's low-cat class. It's about the most offensive thing a man or woman could or do or ever tell a lawyer and I, you know, it's classless, it's ruthless. I have the testimony right here, so it is, it is, I would kick his, yeah. I don't deny that he said that. I don't deny that that is strong language. Inappropriate language. Yes, yes, and I will concede inappropriate language, but what he was responding to was an outrageously inappropriate, factually baseless claim that these lawyers for the defendants had collaborated with the defendants to perpetrate a fraud. There was a statement that the lawyers associated with the trial were in the room somehow with Mr. Moose, coming up with a scheme to defraud Mr. Clapper. That was not true, so when he says accuse me of a felony, that's what he's talking about. He was accused of suborning perjury. I'm not defending the precise language he said, but that's what he's responding to and that is not a basis to overturn a jury's verdict. I mean that we have to come back. Has this been dealt with otherwise? Do we as the court, do we have any responsibilities? Have this been dealt with in state bar or sanctions or any other proper method of dealing with this type of conduct? I'm not aware of any bar proceedings. The plaintiffs haven't pointed any out. I know they did move for sanctions in the district court, so did the defendants. The defendants were asked to move for sanctions. And those haven't been appealed? The motion is still pending, Your Honor, and the defendants were invited to move for sanctions because of plaintiff's counsel's insistence on violating the attorney-client privilege, creating an unfounded false inference that there was some nefarious motive. They were admonished by the court over and over about this for trying to suggest that Mr. Moose had had some collaboration with attorneys. They were admonished during Moose's testimony, they were admonished during the closing, yet they kept doing it. They did it in their post-trial briefs and they have done it on appeal still. A point I need to address related to that, they have now made the argument at page 22 of their reply brief that they invoked the crime-fraud exception to overcome the assertion of attorney-client privilege. They cite record on appeal 38304. That is not true, Your Honor. They never invoked the crime-fraud exception to get around attorney-client privilege. They didn't mention it during Moose's testimony. The issue came up during the charge conference at 4823-26. They didn't invoke crime-fraud then, didn't mention it in closing argument when this came up and he was admonished again at 41123-24. No mention of the crime-fraud exception in response to the sanctions motion that we filed. Yet now, on appeal, they have come up with a baseless argument to excuse the behavior that led the judge to invite the defendants to file a motion for sanctions. I'm not going to tell the court that every comment was appropriate, but that is clear evidence that both sides were pushing it here. And so there is no equitable basis to reward the plaintiffs, especially when they failed to seek available relief that they don't deny they could have done, and when there is no prejudice in any event, because there is a sense that the remedy for that would be to start over and try it properly. If you're all guilty, I mean, one side's guilty of this, that's one thing, but if everybody did it, then I don't know, you either just leave it alone or you start all over. Well, I would respectfully disagree with that, Your Honor, because it's their motion, and they are asking this court, the plaintiffs are asking for extraordinary relief, and I, again, respectfully disagree that starting over is the right remedy, because— I don't think you'd agree to it. Well, but, fair enough. But my point is that the judge let it go to the jury, the jury returned a verdict. That verdict is consistent with the evidence. Well, of course, of course. You have a point, because it's the jury's point, and that is whether or not the failure of proof, and if there's a failure of proof, then that should end the matter as far as the outcome. But what I don't think you can get much traction with is defending the conduct of the lawyers in this case, not trying to save one side or the other. I think, and I understand where you're in as an advocate, and how far you want to go with that, but it's quite clear that this could not have happened, and it's way beyond the payoff. We work very hard, institutionally, through the ends of court and other enterprises to prevent this type of behavior. The Northern District of Texas is pretty close to my heart. I've tried a lot of cases up there on both sides of the docket, and I've never heard of such a thing. The judges that I've tried cases before up there, the lawyers at the time themselves escorted out with the marshals. If they did, frankly, they would never have done it in front of the judges. You know, you'd have a sense in the court here that we don't approve of it, but in that discussion, it's the early on question of what do we do about this case on the field? You figure, you say sort of approximately all your houses go, what do you do? You argue this with plenty of proof so that at least that's the end of the case. And I think that's exactly what you do, Your Honor. There's a complete failure of proof. Yeah, that argument. Right, and so even if there were some basis to set aside the jury verdict, there was a failure of proof. The defendants were entitled to judgment as a matter of law, and so there's no prejudice, no matter how— If we don't prevail on that point, then what do we do? I think if—I'm about to run out of time. May I complete my answer? I think if we don't prevail on that point, then you really have to make a difficult decision whether, based on the evidence and the verdict, there's a violation of substantial rights. And I think the critical question continues to be whether these comments had an effect on the verdict. I think given the evidence in the record and the admission that their expert didn't even provide valuation, I think it's not possible to say that the outcome would have been different. And so that's what our position would be on that. May it please the Court, just a couple of cleanup points. Your Honor, Judge Higginbotham, you asked how long the jury deliberated. I'm informed by my trial counsel, my trial partner, Ms. Ashmore, it was less than a day. Also, counsel stated that the plaintiffs had moved for a mistrial at an earlier stage in the proceedings. That's not correct. For better or worse, plaintiffs never moved for a mistrial. There were two motions for mistrial by the defendants, both of which were denied. But, Your Honors, what I'd like to direct the Court to is an exchange in the record that I think takes this into the level of plain error, takes this into the arena of the denial of substantial justice. And that's at Record on Appeal 41196 and 97. It's a sidebar during a break in response to the use of the term prostitute to describe the expert witness and Mr. Mihaljevic, the lead trial counsel from Michigan for the Clapper parties. And after the Court has said that that word is off limits going forward, Ms. Ashmore says, also being called a liar, dishonest, specifically directed towards Mr. Mihaljevic. It wasn't just prostitute. The Court responds, I will let you all return the favor, meaning we're not in a federal courtroom anymore. We're in the mixed martial arts octagon. You can throw punches back during your rebuttal argument. And I've got to say that's one of the most shocking statements I've ever heard from a federal district court. I will let you all return the favor, meaning they've called you names. You should retaliate in kind. That's not how this is supposed to work. That's why this raises to the level of plain error. I think it's indefensible. What about the argument that there's the failure of proof and so that you would lose the case anyway and so this is much ado? So, Your Honor, we deal with that with some heavy record citations in the first four pages of our reply brief. And I would say that there are three categories of evidence that meet our burden of proof. Also, the district court did properly deny the motion for judgment as a matter of law on this basis that the defendants brought. So this issue was presented to the district court, which adjudicated it and denied the judgment as a matter of law. The first basis for evaluation are the SEC documents that the defendants filed themselves. And those are at Record on Appeal 42037-041. Those are sworn documents that give insight into the value of the transferred assets, the transferred property. In addition, there's a host of citations here. Mr. Frazee, the expert, testified to a range of values under a Texas case interpreting Tufta, which is a state statute, called Citizens National Bank of Texas v. NXS Construction 387 Southwest 3rd 74. A range of values is acceptable when testifying as to a fraudulent transfer. So they take Mr. Frazee, the expert, to task for not testifying as to a specific value. He testified as to a range of values. In addition, there's the evidence that they put on of value, including those SEC statements. And then this bleeds over into two other points of error that we've briefed, evidentiary exclusions that we believe were improper. There were bankruptcy schedules that were excluded from evidence that were subject to a motion for limine, that would have shown, subject to penalty of perjury, a bankruptcy schedule, the value of the transferred assets. Had the district court allowed those bankruptcy schedules in, this would not even be an issue. We've fully briefed that issue. I don't have enough time remaining to go into the exclusion of the bankruptcy evidence. But that also would constitute, in addition to what's already in the record, proof of the value of the transferred assets. I just want to make a point that we have some caution ordinarily about utilization of values from another proceeding with a jury itself because we have found, through experience, that the jury, they're struggling with what's true and false. If they're told that another court has found this X, then that sort of takes it away from them. That's the context of what you're normally supposed to do. Your Honor, I'm about to be out of time. May I answer your question? Your Honor, you're absolutely right that there is normally skepticism of the admission of pleadings from prior cases. But this is clearly relevant evidence. This is a Tufta case. This is a valuation case. You have bankruptcy schedules that go directly to that issue. So they are not only relevant, they are highly relevant and probative. And the standard for the exclusion of such highly relevant and probative evidence is high. There are a lot of things that are problematic, in my view, with bankruptcy schedules. You know, they're self-serving. There are all kinds of issues, so. But that, in addition to the evidence in the record, Your Honor, if that had been allowed in, I think there wouldn't even be a question on the issue of valuation. As it is, I think there's adequate evidence of value as evidenced by what we've put in the first three pages of our reply brief and the district court's denial of the motion for judgment in a matter of law on that issue. It's the opposing counsels. I mean, the opposing parties' bankruptcies, right? It's what they swore to. Absolutely, Your Honor. So it's their self-serving statement. Absolutely, Your Honor. That's what you want to impeach them with. That is correct, Your Honor. That is absolutely correct. I appreciate the court's time and attention today. Thank you.